With her argument next in Case 08-1314, Williamson v. Mazda. Mr. Buchanan. Mr. Chief Justice, and may it please the Court, the issue here is whether a common-law claim that Mazda should have equipped Mrs. Williamson's seating position with a lap-shoulder belt is impliedly preempted under the rationale of Geyer v. American Honda. The claim is not preempted because it is perfectly consistent with and would not frustrate the objectives of the operative 1989 version of Standard 208 governing Type 2 seatbelts and rear seats. One point that is clear from this Court's express preemption holding in Geyer is that Congress intended common law to play a complementary role in achieving the objectives of the Motor Vehicle Safety Act. Based on the Savings Clause, the Court decided that Congress intended to preserve a significant role for State tort law to operate in compensating accident victims and promoting greater safety in vehicle design. And on the issue of implied obstacle preemption, the majority also agreed with the dissent that State common law will not be preempted unless there is clear evidence of a conflict with Federal objectives. Scalia. Why would the Federal Government do that? I mean, trust juries to supplement whatever the Federal rules are, but not permit State agencies who study the matter with experts to supplement what the Federal government does? Why does that make any sense, to just say, oh, you know, we don't want the State government mucking around in this area, but, of course, juries can do so? Why does that make any sense? Justice Scalia, I think the Court answered that question in Spreetsma, where it said common law has an important role to play in providing compensation to victims. And therefore, the Court found it rational in Spreetsma to make that distinction. And ultimately, it's a judgment call for Congress to make. Oh, I don't doubt they made it. I'm just curious as to why it could possibly have been. Well, unless lawyers bring suits before juries, maybe. Well, Justice Scalia, I believe common law has an important role to play, not only in compensating victims, but also in providing manufacturers with an incentive to develop safer vehicles, even safer than the Federal minimum standards. I thought the reason that the Solicitor General gives for not that NHTSA did not immediately require the Type 2 seat belt is because the costs would have been higher. Is that your understanding? Mr. Chief Justice, for the aisle seating position that we're talking about in this case, the reason NHTSA decided not to mandate it immediately was, A, a concern about obstructing the aisleway with the shoulder belt, and, B, a concern, yes, about the cost of a possible alternative design. How come allowing, or why doesn't allowing the relief you seek under State law impose those same costs, contrary to NHTSA's objective in not making those mandatory? Well, Your Honor, any time NHTSA creates a safety standard, it necessarily takes into account costs and benefits and the safety attributes. So the State tort action does not. A State tort action does. What I'm trying to do, the point I'm trying to make, Mr. Chief Justice, is that if that were sufficient to preempt, then any minimum standard that NHTSA creates would therefore preempt State law, and it would nullify the savings law. No, I suppose, I understand that argument. I'm not sure it's right, though, in the sense that NHTSA may decide not to make particular standards mandatory for reasons other than cost. It may decide it doesn't think the technology is adequately developed. It may decide that it doesn't think there are adequate, you know, mechanics prepared or involved. But here it's because of the cost, and the relief you're seeking, it seems to me, directly imposes the costs that NHTSA decided not to require. Well, NHTSA made a decision as of 1989 that the technology, it obviously had concerns about the technology and cost. But any type of consideration of technology and cost is as of that moment in time. And the agency specifically encouraged manufacturers to install Type 2 lap shoulder belts in these types of seating positions. And our lawsuit is perfectly consistent with the agency's objective of encouraging lap shoulder belts in these seating positions by 1993. Well, every — there's no objective that the government pursues regardless of costs. I understand that their objective was to encourage this, but it was clearly not to impose it because it thought at that time that the costs were too great. So to simply say their objective was to get these in ignores the other side of the cost-benefit analysis. Well, I think what the agency did with respect to these seating positions in 1989 is, A, it recognized that there were tremendous safety benefits for Type 2 lap shoulder belts. And, yes, it found enough countervailing considerations in terms of cost and feasibility not to mandate that as part of the Federal minimum standard. And so from the Federal Government's perspective, for these seating positions, the government was neutral as between Type 1 and Type 2 belts. Either one of those belts would have sufficed to satisfy the Federal agency's objectives. And, therefore, a State law claim that eliminates effectively one of those options does not in any way frustrate the agency's objectives. The government has explained in its brief that its objectives would have been fully satisfied if all car manufacturers had installed Type 2 lap shoulder belts immediately. Why is that different from Geier? Didn't the automobile manufacturer in Geier warrant the manufacturers similarly left to do, choose for themselves, whether to have one type of constraint or another? They were, Justice Scalia, but the Court's decision in Geier did not turn on the mere fact that the manufacturers had a choice. And Mazda is not asserting that claim here either. The determinative agency policy at issue in Geier was that the agency deliberately sought a variety of different passive restraint types. It was concerned about public backlash against airbags, and it wanted to encourage the development of alternative passive restraint systems. Kennedy, but you're saying that once the government gives the manufacturer a choice, then the jury, the tort system can second-guess it. And that is not consistent with a likely government intent to allow the manufacturers a choice based on the technical advances to that date. Justice Kennedy, I don't think that the government gave manufacturers a choice. It gave them two different options for complying with a minimum standard. But it didn't suggest that foreclosing one of those options would in any way frustrate its objectives. It didn't suggest that it thought State that there should be some. Well, suppose the government says you have a choice, and the State of Iowa passes a law and says you don't have a choice. No frustration of the governmental purpose there? It depends what the reason for the choice is, Justice Kennedy. No, there's just the statutes as I've given them to you. Is there preemption just on the face of the statute? Not if it's just simply creating a minimum standard. There's no preemption. That's what the statute calls for, minimum. Yes. The agency is to set minimum standards. And then I take it that the Court in Guyer said it wasn't a minimum standard because if a State deviated from it, it would detract, it would be an obstacle to the realization of the Federal standard. But here, the minimum standard was adopted, minimal standard, and I think the agency is telling us it's the opposite of what it said in Guyer, right? Exactly correct, Justice Ginsburg. In Guyer, the agency was the entity putting forward the theory of preemption that this claim by Guyer that all Honda vehicles should have been equipped with airbags frustrated its intent to accomplish a whole variety or mix of passive restraint devices. It was a direct conflict with the agency's objectives. Here, the agency is telling us the exact opposite. It was not trying to further choice or variety. It was not trying to maintain a diversity of Type 1 and Type 2 seatbelts in rear seating positions. Its objective was to obtain the greater safety benefits of Type 2 seatbelts. The agency found that Type 2 seatbelts were more effective in preventing fatalities and serious injuries, that they offered greater overall protection for children, and most fundamentally, that they actually increased seatbelt usage in rear seating positions. Our common law theory seeks to obtain all those exact same safety benefits for aisle seating positions. And we know by 1993, when this vehicle was manufactured, at least one major manufacturer, GM, was in fact installing Type 2 lap-shoulder belts in aisle seating positions. Our complaint alleges that it was perfectly feasible for Mazda to do so in 1993 when it manufactured this vehicle, and that it was unreasonable not to do so. And that's the point. Kennedy. Of course, under your theory, if I understand your case, correct me if I'm wrong, if GM had installed the Type 2, they could have been sued on the theory that Type 1 was better, and there would have been no preemption. I think that would be a much more difficult case, Justice Kennedy. But under the theory of your case, that suit could go forward. That's correct. Theoretically, that suit could move forward. But the question that the Supremacy Clause asks is not whether hypothetically there might be future conflicting jury verdicts. The question is, does our claim here that we're asserting under California State law conflict with the Federal objectives? It does not. The agency has told us it does not. There is nothing in the contemporaneous regulatory history of the Type 2 seat belt rule. Roberts. What if the rule here had another provision that said you must have Type 1, you can have Type 2, but we're not you can have Type 2, right? But we are not requiring Type 2 because we think the costs on manufacturers would be too great. We may require it in the future, but not now. Is it the same? Is your position the same? My position would be the same. There is no preemption there. Well, doesn't the increased costs that are imposed by the tort liability conflict with NHTSA's determination, in my hypothetical, that they're not requiring Type 2 because of the cost? Your Honor, but any time that agency considers costs, it's at a particular moment in time. And it's not necessarily a determination that for all the future this should never be done, and no State law should ever mandate that it be done. And that's what we have here is not only a determination that there were cost issues, but an affirmative encouragement to manufacturers to do what our States I think there was never preemption under this regulation. I think what you're saying, the statute says minimal standards, and the agency said no obstacles, and that's it, that it's — if there is a preemptive force to the — to the safety standard, then it's a preemptive force. And more than it is for the government administrator to say that. Correct, Justice Ginsburg. And not only does it say minimum standards, it explicitly says in the savings clause that mere compliance with a motor vehicle safety standard shall not exempt the manufacturer from common law liability. It said all those things in Guyer too, didn't it? It did. But again, the key dispositive fact in Guyer was the agency's desire to achieve a variety of different passive restraint devices, and a claim that the entire Honda fleet should have had airbags would directly conflict with that. That was the dispositive fact in this Court's decision in Guyer, and that is what is lacking here. And what we have here is much more of a case of compliance with a motor vehicle safety standard. Scalia. Your judgment here doesn't apply to the entire Mazda fleet, supposedly, right? Just to the car that caused harm to the plaintiff. No, that's not correct, Justice Scalia. It's not a matter of whether it's the entire fleet or not. It's a matter of whether the common law claim conflicts with the Federal objective. And in Guyer, it conflicted because the objective was variety. What about the next case? Let's assume a similar case. Is that jury bound to come out the same way as to whether there should have been the shoulder constraint or not? No, Justice Scalia. That's something that the Court in Guyer contemplated and discussed. The Court in Guyer acknowledged that. But Guyer came out against you. I should be appealing to Guyer. I don't think Guyer fully supports us, Justice Scalia. And certainly on the express preemption issue, the Court acknowledged the possibility that there could be conflicting results in consistent jury verdicts, which is always Why are you looking to Guyer when you have a statute that says common law remedies are saved? I mean, it was Congress that said that. Maybe it didn't make a whole lot of sense, but they did. I agree with you, Justice Ginsburg, but I think Guyer also says that. Guyer relies on the savings clause to say that there is a significant role for common law in the possibility of inconsistent jury verdicts. The Court in Guyer said the possibility of non-uniformity, the savings clause reflects a congressional determination that that's a small price to pay for a system where juries create and enforce safety standards and simultaneously provide compensation to victims. So I think that's something the Court considered in Guyer. I'd like to reserve the rest of my time for rebuttal. Thank you, Counsel. Mr. Jay. Mr. Chief Justice, and may it please the Court, Respondents chose to comply with the Federal minimum safety standard by installing a Type I seat belt, but the savings clause makes clear that they are not exempted from the consequences of that choice under State common law when that choice results in injury. They must show that, as Guyer makes clear, that the State law rule of decision would pose a conflict with an articulable Federal policy. They haven't shown that here. I'd like to go first to the question that the Chief Justice asked my friend, Mr. Buchanan, about cost-benefit analysis and the Federal judgment that at the time the imposition of a national uniform Federal minimum standard of Type II seat belts wasn't warranted at these seating positions. Simply saying that, and I'm simply saying that is not enough to establish that the Federal agency wished for the adoption of Type II seat belts not to happen. Every, as Mr. Buchanan said, every Federal rulemaking, certainly every NHTSA safety standard adoption must include. Roberts. No, I agree with you. It doesn't require, it doesn't support the inference that they did not want Type II seat belts to happen, to be used. It does, in my hypothetical view, support the inference that it didn't want to mandate Type II seat belts, because it was worried, as you said in your brief at page 9, about the cost. And yet, its worries about the cost, it seems to me, are overridden by the position that State tortsuits can go on for the absence of Type II seat belts. Well, of course, the baseline is that State tortsuits can always go forward, and in this case, the agency decided not to impose this nationwide mandate because of the tradeoff between costs and benefits. The benefits were significant. Everyone recognizes that. Everyone recognizes that Type II seat belts were better for, better or at least equivalent on for all categories of passengers, and I will come back to that. But as far as the imposition of costs go, NHTSA decided that it was not worth it at that time for NHTSA to require that. That doesn't mean that NHTSA wanted to adopt a policy of freeing manufacturers of any obligation to incur those costs, let alone that it wanted, for example, if NHTSA had thought that it would harm safety for manufacturers to spend that money on Type II seat belts instead of something else, it could have said that. In Guyer, for example, the reason that the agency deliberately sought variety in Guyer. Sotomayor, I'm sorry, Justice Sotomayor. Sotomayor, it said that there was difficulties with pre-1989, 82 or 84, that there were difficulties with Type II belts and children's safety. So was this preempted in 82, 84, and not preempted by 89? No, Justice Sotomayor, it was not preempted at any time. So what do you need for the agency to say before Guyer comes into effect? Well, I think the lower courts, what's the minimum that lower courts missed here in not coming to the conclusion they did in their application of Guyer? The contrast between this case and Guyer is that this case, like Guyer, involves options, but it does not involve a Federal policy that those options, that the manufacturer must remain free to choose among those options as it sees fit. In Guyer, I'm sorry, I didn't mean to interrupt. I was going to say in Guyer, the manufacturer, the agency concluded that it would disserve safety if automatic seat belts and airbags were not both on the market. There's been no such determination here, either in 1984 or at any other time. Isn't it true that for a period of 10 years, the lower courts uniformly held that there wasn't any preemption here? And if that's the case, why didn't the Federal government come forward at any point during that time and say that this is preemptive? Two responses, Justice Alito. First, the question presented here about Type I v. Type II seat belts has only been decided by a couple of Federal courts of appeals, no State courts of last resort. Second, on the more general question, why doesn't NHTSA participate in these cases? NHTSA, as a matter of course, does not usually participate in private party litigation under State common law, even when that litigation might touch on a State, on the interpretation of a Federal safety standard. And when the courts ask for NHTSA's views, NHTSA generally responds. As this Court asked for the government's views in this case, and the government responded. And I think if the Court were to look back to the first brief that the government – in the string of briefs that the government has filed about these issues under this Act, the brief in Wood v. General Motors filed in 1990, you could predict the position that the government was – would take in this case from that brief. The government said in that case that options don't preempt merely because they are options. In most cases, there will be no Federal policy that presents a conflict. That case presented the case of the passive restraint phase-in, and there it was the rare circumstance, as the Court later held in Guyer, where there was frustration of the Federal policy. But that's because the Federal policy was to encourage variety, not just for its own sake, but because variety would serve safety. The roads would be measurably less safe if airbags were rushed into service. By contrast, in this case, NHTSA would have been perfectly happy if every manufacturer had installed Type 2 seatbelts the day after the 1989 rulemaking. So there was no conflict. As far as the child safety concern, to which Justice Sotomayor alluded, it is referred to in the 1984 denial of a request to impose the rule that later was imposed in 1989. The agency said that it had concerns about how particular child seats, which at the time were anchored with a form of tether, and it said that it thought that the continued use of tethered car seats was something that it chose to encourage rather than anchoring them with Type 2 seats. The agency did not speak at all to whether Type 2 versus Type 1 was better for child safety, and the agency then answered that in the 1989 rulemaking. So for adults, Type 2 seatbelts are safer and they encourage seatbelt use because they are more popular. For infants, the agency specifically asked whether Type 2 seatbelts could be as efficacious as Type 1 seatbelts in holding an infant car seat in place. It concluded that they could. That sat out at page 25 of our brief. And for toddlers, children who are too small to sit in a Type 2 seatbelt without assistance, the agency recommended booster seats. And if there was no booster seat, the agency recommended that they not use the shoulder belt. Not that they detached the shoulder belt. The agency, indeed, specifically rejected the idea that the shoulder belt should be removed at page 47990 of the notice of proposed rulemaking. Alitoso, if a child were injured by a Type 2 belt, would a suit based on that be preempted? If a child were injured by the Type 2 belt and the suit would be on the theory that a Type 1 belt should have been installed, at that time, no, that lawsuit would not have been preempted. Mr. Buchanan said that that would be a harder case, and I think he said that because the agency was specifically encouraging Type 2 seatbelts, and in this case, Respondents can't show anything suggesting that the agency was encouraging Type 1 seatbelts. So it might be a harder case for that reason. But at that time, there were two ways of complying with the Federal Minimum Standard, and the Savings Clause provides that simply complying with the Federal standard does not preempt the operation of State common law. So we've discussed the child safety, the alleged child safety rationale. I want to say a word about the idea that aisle seats were unsafe for the installation of these seatbelts. As Mr. Buchanan mentioned, the agency specifically encouraged the installation of those seats where it was feasible. It was found to be feasible in 1991 by General Motors, which installed them. But another word about that, because Respondents have suggested that the chief counsel of NHTSA has said in 1994 in a letter something favorable to their position, and that letter is reproduced in the appendix to the Petitioner's reply brief. And I urge the Court to look at the entire letter and not just the sentence that's What the agency said was that in response to someone who complained that his – that manufacturers were installing Type 2 seatbelts, and they said, the complainant said, that makes these minivans unsafe because people will be trapped in the backseat. The agency said it disagreed that people could go under the safety belt, that they could detach the safety belt, that the safety benefits of a Type 2 seatbelt outweighed any convenience concern about access to or egress from the rear seat. And I think that's perfectly consistent with the policy NHTSA has taken all along. Type 2 seatbelts are safer, more effective, and to be encouraged. When NHTSA decided not to mandate that, based on its understanding at the time of who used seatbelts, who used seatbelts in the rear center seats, and what the – how many fatalities and injuries would be prevented, and whether the dollar cost would be justified by the dollar equivalent of injuries and fatalities prevented, it wasn't making a preemptive judgment that Type 2 seatbelts therefore should not be installed. And for that reason, there's no frustration of anything that NHTSA had in mind in the 1989 rulemaking by allowing this tortsuit to proceed as saved by the Savings Clause. If we adopt your view, would Geier apply to any other regulation? I don't think that Geier is good for that day only. I do think that, as we said in Geier, in the brief in Wood to which we alluded and so on, that Geier is the exceptional circumstance. That was, of course, exceptionally difficult and unusual rulemaking. The phase-in concern in Geier, one can easily envision being replicated in another safety standard issue where the agency were to conclude that it's going to impose a new requirement, but it does not want it rushed into service in an entire fleet right away, and so it affirmatively discourages hurried installation. But that's not the case here, because the agency actually encouraged earlier compliance. Thank you, counsel. Mr. Garre. Thank you, Mr. Chief Justice, and may it please the Court. In 1984 and again in 1989, the agency specifically determined that the statutory safety and practicability objectives would be best served by giving manufacturers the flexibility to install a lap-only or lap-shoulder seat belt in the rear. Sotomayor, could I ask you a question? How is this case different from a situation where the agency looks at a request for a minimum standard, says, require that a certain light be added to the lights in a car. The agency comes back and says, you know, there are so many designs of cars. In some cars, particularly sedans, the light is an added safety feature. In vans, it may not be because of the size of vans. And so we're not going to require it. We're going to let manufacturers, depending on what design their car has, to choose between the two so that we're not going to set a minimum standard for everyone because there are too many different designs. Despite that ruling, the manufacturer says it costs 2 pennies more to put this light in a sedan. I know the agency has said it's safer, but I don't want to do it. I don't have a van. I don't have any reason except the 2 pennies that I don't want to do it. Is that case preempted because you were just merely given the option? The typical case where a Federal Motor Vehicle Safety Standard establishes only a minimum, like the standard for braking performance or roof structure, is not going to be preempted. Guyer says that. We're not challenging that. Sotomayor, how is this different from the hypothetical where the agency said there could be an obstruction with the entry, but manufacturers who can design it without  How is this case different than the one that's presented? This case is different because the agency specifically recognized in 84 and 89 that there were serious safety and practicability tradeoffs between these two different design options, and specifically gave manufacturers the option of installing one type of seat belt or the other. Nothing the agency that I can find says that the agency really wanted a mix of options. I mean, they said it's up to the manufacturer, but in Guyer, which I think all of this could be just avoided, if the agency would simply say, do they want to have this to be a maximum or just a minimum? It's so easy to say that, but I haven't found agencies saying it. I don't know why. We're forced to deal with the situation we have. And the situation we have in Guyer was filled with indications that they really wanted a mix because of the unusual circumstances present there. You have to point to something here that shows that. What the agency wanted here was flexibility. It wanted flexibility because it recognized that there were safety tradeoffs and that the safety and practicability objectives were best served by leaving But wait a minute. What you're not answering is flexibility to ensure that a manufacturer imposes or thinks about safety and chooses the option that's safest. Sotomayor, and so what's the inducement for a manufacturer to put the light into a sedan or to put a seatbelt to when it can without causing an added safety risk? If it's preempted, there's no inducement. The agency recognized here that Type I seatbelts, the lap-only seatbelts, themselves posed unique safety risks. It did so to children. If you look at the 1984 rulemaking, the agency couldn't have been more clear that we're not going to impose a Type II mandate for rear seats because that's going to be harmful to children. The agency preserved that very status quo in 1989. Petitioners recognized that and note one of their briefs. Ginsburg. And in Guyer, I think it was Justice Breyer who called attention to the agency having informed the Court that if tort suits were to go on in contradiction to the government's view that there should be both of these, that the safety standard that was set there, it would be disturbed, it would be impeded. And the opinion said, we assign weight to the Department of Transportation there, to their view that a tort suit there would stand as an obstacle to the accomplishment of the Federal safety standard. And if the Court gives weight to what the agency says, in Guyer, shouldn't it equally give weight here when it's telling us there is no conflict? It says its rule sets out what the statute calls for, a minimum standard. We don't think the Court should defer to the agency's position. We don't think the Court should adopt it. In Guyer, the Court found that the regulatory record was clear enough that it didn't have to rely on the agency's position. We think that the Court should adopt it. But then what was the Court doing in saying that? Was it just wanting the agency to feel good? Well, I think what it said, and obviously Justice Breyer can correct me, he wrote the opinion for the Court, was that it thought the regulatory record was clear enough, but it did ultimately say that it did agree with the agency, although it didn't make a difference to the Court. Breyer, it also said it did say that it was a practical thing, not some theoretical legal thing. Who is most likely to know what 40,000 pages of agency record actually mean and say? People in the agency. And the second most likely is the SG's office, because they'll have to go tell them. So if the government continuously says this is what the agency means and the agency is telling them, yes, this is what it means, the chances are they'll come to a better correct conclusion than I will with my law clerks, because I have a lot to do. All right. Now, that's practical. I'm sorry that that is the practical idea that I think underlies what was said in Guyer. And from the Wyeth case, we know that the Court isn't always going to agree with the agency. Here, I think what's different from Guyer is that you have no contemporaneous interpretation of the agency. The agency is looking at a cold record going back 20 years, and it's not taking to account everything that's in the record. Breyer, we are dealing with 1989 primarily. And in 1989, I think, we're at least quoted on the other side as what the agency said was, well, we see these lap and shoulder belts are actually more effective. Now, we're reluctant to recommend them for the center seat or the aisle seat because people might get caught in the spools. On the other hand, manufacturers may be able to work out that problem. Therefore, we encourage the manufacturers to try to figure out a way around it. And the SG, looking at all that stuff, says, you see, they didn't mind if manufacturers were put under another legal obligation to do it, because they'd have no objection to making the manufacturers do it. They're just not certain yet. Now, that's how I read what was said. And I think that's what the SG says, and we think that the SG is wrong. We think the agency said in 1989, and it said in 1984, it couldn't have been more clear that they did not want to mandate the Type 2 belt, the very rule that Petitioners want to mandate through this State law toward action. They didn't want to do it because they were concerned about child safety, they were concerned about aisle safety, they were concerned about practicability. Sotomayor, But that's always the case when the agency sets a minimum. By setting a minimum, it's basically saying we don't want to mandate more. But you're not disagreeing that the statute by its term says that a minimum doesn't preempt State common law? The statute says that, and from Geier we know that that doesn't resolve the preemption question. Sotomayor, I'm still not sure why creating an option is any different than the minimum. Where the option is designed to create flexibility that serves statutory safety and practicability. But the default is always that the manufacturers have an option. A minimum by definition gives manufacturers options. It's not. That is a practical matter. That kind of option, like the minimum for Federal breaking standards, is fundamentally different than the kind of option in Geier and the kind of option here. Sotomayor, but you haven't explained why. The reason why is because the minimum by its own definition gives freedom to the manufacturer to impose more if it chooses or not. Why does the option to tell a manufacturer, pick what you think is safest, why does that do more? Because the agency determined here that the flexibility was necessary to advance Federal safety and practicability objectives, and that that, those objectives would be frustrated by a Type 2 mandate. And flexibility, this Court has recognized. Ginsburg. But there was no such statement. I mean, there was a statement, we don't want to impose those costs. But we have the agency in court, we have the Solicitor General's office in court telling us, the statute says minimum, the statute says the common law isn't displaced, and we are telling the Court that we think this is a situation where it is minimum and so the common law isn't displaced. Shouldn't we assume that the standard that the agency set, the standard the agency sets, is a minimum standard unless the agency tells us that it should be preemptive of tort suits? Not where you have the kind of unique standard here. And granted, this is going to be the rare situation. But if you look at, for example, take child safety, the agency couldn't have been clearer in 1984 and look at 49 Federal Register 15241, the final rule, that it was not going to mandate Type 2 seatbelts because they found that that would harm child safety. The agency specifically carried forward that rule in 1989 for the rear inboard seats at issue in this case. Note 1 of Petitioner's reply brief said that the law is exactly the same in 1989 as to these seats as in 1984. It had to have been preemptive in 1984, notwithstanding what my friend said here from the government today. And if it was preempted in 1984, it has to be preempted in 1989. The tradeoffs here, we've talked about the lawsuit involving a child who was restrained by a shoulder belt and harmed as a result of that belt, which was a concern that throughout its history, under their position, the manufacturer could be sued for having a Type 2 belt by the child who was harmed or by the person in the back row who had difficulty getting out of the car in the event of an accident, just as much as they could have been sued under Petitioner's theory for having a Type 1 belt. The agency recognized this was a unique situation where there were serious safety and practicability tradeoffs. They wanted to give the agent, the manufacturer's flexibility to make this decision, and that flexibility served, the agency concluded, the Federal safety and practicability objectives. If you look at this Court's decision. Sotomayor, you still haven't responded to me. Manufacturers are always at risk for common law claims under this statute, because this statute expressly says they are. Every design choice a manufacturer makes under almost any situation where the common law is in effect puts it at risk that a jury will decide whether it did enough or not under cost-benefit analysis and technology. So I don't know why, when the agency creates a minimum, by choice or not, it should be implicitly preempted in the application of State law. And, Justice Sotomayor, there are hundreds of Federal motor vehicle safety standards, and I would agree with you for virtually all of them, except you have the rare standards, and they are rare, like the one in Guyer and like the one here, where the agency quite obviously is doing something much different. It's expressly granting options, and it's making clear in the record that the reason it is doing that is to serve Federal objectives that would be frustrated by the imposition of a particular rule. And I think you have to look at this from the standpoint of the manufacturers who are told that they can manufacture their car with this design or that design and can go and look at the Federal register and see that the reason the agency is doing that is to advance safety and practicability objectives. Roberts. Roberts. How do you tell, in response to Justice Sotomayor, how do you tell whether the agency is giving options or simply setting a minimum? Because a minimum, of course, always gives you options. In a very generalized sense, but we know from Guyer that that doesn't resolve the preemption question, because the same could have been said with respect to the rule in Guyer. First, you would look at the rule, and you are just not going to find very many rules at all in the Federal register, in the Code of Federal Regulations that provide this kind of express option for equipment design. And then second, you would go look and you would say, and you would see what the agency said about that in its final rules, in the commentary accompanying the final rules. And here, if you looked, not only would you find that the agency granted this flexibility to serve Federal safety and practicability objectives, you would find that it specifically rejected the very rule that Petitioners want to impose through State tort law, because it concluded that that rule would be counterproductive from the standpoint of safety and practicability. So there could be the need to say that. Ginsburg. But that was true in 1989? I thought there was some advance in the child seats that you were between early 1980s and 1989. There was some question about a movement from tethered to non-tethered, but that only created the compatibility issue that the agency recognized in the 1989 rulemaking in 1984. I mean, at the same time, the agency is telling manufacturers, install your – manufacture your car seats so they can be installed with a type 1 lap-only belt. And it's telling parents, parents, put your children in the rear center seat, because that's going to be the safest seat, which, by the way, is the seat that's going to have a lap-only belt. And so it's clear. Sotomayor, did they say that in 1989? That was true at the time of 1989 as well as 1989. But this wasn't the center seat. This was an aisle seat. It was, as the plaintiffs called it in their complaint, the middle seat of the middle row. It was a center seat in every practical sense. It just happened to be an aisle seat as well because there was a space on the side. I don't understand that. And I looked for a diagram. They talk about the center seat, aisle seat. And unfortunately, the diagram is not in the record, Justice Sotomayor. But you have three rows in the car. In the front row, you've got the driver's side and the front row driver on the right-hand side. And then you've got the middle row seat and you've got a back row. The middle row seat had a seat on the side, which was the outboard seat, a seat in the middle, which is where the seat in this case was sitting, and then it had an aisle next to it. So it was a center seat. The aisle was not between the two seats. No, it was on the side of the vehicle. So it was a center seat in every practical sense and therefore created the same structural concerns that NHTSA recognized. Breyer, as they wrote, Of course, in those cases where manufacturers are able to design and install lap-shoulder belts at seating positions adjacent to aisleways without interfering with the aisleways' purpose of allowing access to more rearward seating positions, NHTSA encourages the manufacturers to do so. And let me make clear. It doesn't sound like they're against a tort suit that would require you to do so, because in principle, at least, all those things should be taken into account. If I can make three points in response to that. First, as the language you just read indicates, it didn't require or encourage at all costs. It encouraged where this specific safety concern could be addressed. Second, there's a world of difference between saying we encourage manufacturers to do what's appropriate when they can practically do so and a world in which a jurisdiction or a jury could have decided that they have to do so. Breyer, those arguments are what I think Justice Sotomayor was saying. It is a huge problem for manufacturers. It's called tort suits in different places, in different juries, in different States. But that's beyond the scope of this case. If the agency wants to displace those tort suits, often all they have to do is say that the purpose is something like you're saying and that they are intended to be displaced. But we know from Geier that the agency doesn't have to make a formal statement of that intent. Breyer, that's why I'm only making this comment rather than in the form of a question that maybe I don't understand why they don't, it would make our job simpler. I think the record, we certainly think the record here, the agency really couldn't have been clearer in saying we don't want the Type 2 mandate, the lap-shoulder mandate the Petitioners are trying to impose here. It said it and I think it was the agency. But the government doesn't read what it said the way you do. We are being told here that far from encouraging Type 1, all along the government said, yeah, Type 2 is a better seat belt. Well, that's just not true. And with respect to the government, I don't think that the regulatory record supports that generalized statement that it was Type 2 at all costs. It was clear that the agency recognized that. Ginsburg. No, they did say the reason that we're not making it mandatory is on some cost-benefit analysis, we don't think we should impose that as a minimal standard. And gave the very unique kind of option here. The agency identified several costs with imposing the Type 2 mandate here. It recognized the unique safety concerns present where you're trying to stretch a Type 2 belt across the aisle, which is going to block access, which is a clear safety concern. It identified the child safety concerns, which were the basis for this very same option in 1984, and which were carried forward when the agency preserved the status quo for the rear inboard seats at issue here. It recognized other safety concerns, including obstructing the rearward vision of drivers when you install the Type 2 belt in the center seat because you can't  Alito, in 1989, hadn't the agency decided that the child safety concerns were no longer applicable? No. And the portion of the notice proposed rulemaking that's cited refers to the no positive or negative effects. In that language, it does not lead to the conclusion that the government or Petitioner suggests for a few reasons. First, the agency was referring only to rear outboard seats, not rear inboard seats, the kind of seat at issue. And that's important because NHTSA was telling parents, put your children in the rear center seat, the inboard seat, because that seat also was the seat that was most likely to have the lap belt, which is how NHTSA was telling child seat manufacturers to install their child seats, so you could install them with the lap belt, because it was more compatible with that. Second of all, that the reference to the no positive or negative was a tentative assessment. If you look in the Federal Register where that language appears, it's on 53 Federal Register 47988 to 47989, the agency said this is a tentative assessment, we want your comments on this. Comments came back and the agency backed off from that and said we have to explore this more. And secondly, that positive, no positive or negative statement could only imply when child's – when children were using the boosters, which would help with the Type II shoulder belt so that the belt wasn't going over the neck. But NHTSA knew at that time that very few, less than 1 percent of parents, were actually putting their kids in the booster seats. This was 20 years ago. This was at a time when many children weren't in car seats at all, no matter what NHTSA was saying. And so they recognized that there were real risks here. The children with a Type II belt, just to be clear, and NHTSA recognized this during  because the shoulder belt that is terrific for adults is going to take – is going to create unique chest loads on children, and if the children is not on a booster, as virtually all were not, the belt is going to appear too high on the head, on the neck, or on the head, which is not what you're looking for. Scalia. Why didn't they prohibit it, if they were so sure about that? They still allowed it, didn't they? Phillips. This was something, Justice Scalia, that the agency struggled with for almost a decade until it ultimately adopted the LATCH system, which resolved the compatibility issue of the LATCH belt versus the LATCH shoulder belt for installing the child car seat. I mean, anyone who's tried to install a child's car seat with a Type II belt, the LATCH shoulder belt, knows how difficult it was. And the agency went back and forth on this, and ultimately went in a completely different direction in 1999 and installed the LATCH system. And the other thing that happened is over time, booster seats became more accepted. More parents were putting children in booster seats. We solved that safety concern as well. But 20 years ago, at the time that this rule was adopted, the agency clearly appreciated the child safety risk. Again, in 1984. Scalia, why shouldn't we allow the juries to take account of those changes over time? Because it would. And as you say, the agency's rule only spoke of the situation at that time. This was an area that NHTSA was carefully monitoring. You had rulemakings in 84 and 89, and it adopted a very unique approach to resolving the safety issue, which was to expressly give manufacturers this option to advance Federal safety and practicability objectives. We haven't talked as much about the practicability objectives, but that is one of the statutory objectives of the Act. The Congress couldn't have been more clear on that, and the agency in 1989 couldn't have been more clear in the final notice saying we're not going to require manufacturers to install Type II belts in the rear center and aisle seats, because that's just too costly. It's substantially expensive. And the agency well knew, based on its history, that imposing the sort of overly costly safety measures that the Type II belt would have been for these seats at that time could prove counterproductive with the agency's long-term safety mission. The agency said that in the rulemaking in this case at 52 Federal Register 2219, where it said that requiring these kind of overly costly measures created a lost opportunity to improve safety through other means. This is something that Congress gave the agency the expert judgment to make on these matters, and the practicability objective, which was just as much a statutory objective as a safety objective, would have been directly frustrated if, as could have happened under the Petitioner's position in this case, on the very day after the agency passed this rule in 1989 and said we're not going to require rear inboard seats to have Type II lap-shoulder belts, a jury in California hit my client with a multimillion-dollar punitive damages award because they did not install a Type II belt in that seat. That would have been directly contrary to the Federal objectives. It would have undermined the safety objectives that the agency recognized. It would have undermined the practicability objectives that the agency recognized. And then you'd have this world in which manufacturers like my client could be hit with multimillion-dollar punitive damages award in one State for installing the Type II belt where a child was injured or someone was in the back seat and couldn't get out. Ginsburg I thought we were told that there was one manufacturer, I think General Motors was mentioned, that was doing the Type II belts uniformly. I think that was later in time. It wasn't in 1989. Truthfully, if you look as late as 2004, when the agency adopted the so-called  Even then, the agency recognized that there were still technical feasibility concerns with installing the Type II belts in these seats. And just to be clear, the problem is, is finding the anchor to install the shoulder belt in the rear center or aisle seats. You've got to anchor it somewhere. If you put it in the sidewall, you're going to have straps crossing across the aisle and obstructing access. If you put it in the roof, you're going to have something that is very visible. Sotomayor But that's not the case here. The issue is whether it was feasible in this car. Not whether or not it was not feasible elsewhere. And the agency resolved conclusively that it was not practical in 1989. Was it theoretically possible eventually to manufacture? Sotomayor If you take my point of the light in the sedan versus the van, it's letting the manufacturers decide what's the best choice. It gave them that flexibility. The agency determined in the 1994 chief counsel letter, and we hope the Court does read it, makes it clear that the agency concluded that in this situation, and it's a rare situation, the manufacturer was in the best position to decide what was most appropriate for its vehicles. And again, there's this flexibility objective. And if you look at Fidelity Federal Savings and Loan v. De La Cuesta, the decision cited on page 19 of our brief, you have this Court recognizing that a Federal law that gave flexibility where you have a State mandate that interferes with that flexibility that is an actual conflict. Ultimately, under Geier, this Court is looking for the existence of an actual conflict. We think a rule that says manufacturers, you are free to choose between this type of seat belt and that type of seat belt, and the reason that we're giving you that flexibility is to advance Federal safety and practicability objectives. We are not going to require you to put a lap-shoulder belt in there, because that would frustrate those Federal objectives. The State law towards you that would mandate the very thing that the agency chose not to, to advance Federal objectives, is preempted, if there are no further questions. Thank you, counsel. Thank you. Mr. Buchanan, you have 4 minutes. First of all, I'd like to clear up the child safety issue. And I know Mr. Jay has addressed this to some extent. But let me be perfectly clear. There is absolutely nothing in the 87 to 89 regulatory history that mentions anything about child safety being a consideration in the agency's decision not to mandate type 2 shoulder belts for aisle and center seating positions. Specifically, Justice Ginsburg asked Mr. Garr about whether there's anything about the rear center seat being the safest place for children in that regulatory history. There is no mention whatsoever in that regulatory history about that issue. And the reason for that is this. The reason the rear center seat was considered safer for children had nothing to do with the type of seat belt that was installed in that seat. It's considered safest for children because it's farthest from the potential points of impact in a side impact collision. When you talk about safety to children, are you also addressing the strap going across the aisle or the strap interfering with vision? I know that's not directly related to children, but it affects what type of belt might be the safest overall. You're right, Mr. Chief Justice. That was not expressed in any way in terms of a child safety concern. I would also, minor correction, the interference with rear vision was a comment that a commenter made in the regulatory history, and the agency never really expressed  I think what's really important here is that State tort law provides an incentive for manufacturers to exercise their options reasonably. And whether that option is to exceed a minimum standard that doesn't have options or to choose between two different options that a minimum standard provides, State tort law ensures that manufacturers act reasonably. Our contention is that State tort law doesn't – juries typically don't take into account the fleet costs of avoiding liability, which, as I understand from the SG's brief in this case, was the reason that type 2 was not mandated, because of the overall costs. If you have a jury with an injured plaintiff, they're not likely to weigh heavily the fact that this would cost 3 extra cents per car fleet-wide. If that is the sort of thing NHTSA considers. Mr. Chief Justice, under any State's tort law, I think costs and feasibility would be practical considerations for the jury under the jury instructions given. Those are liability issues, costs and feasibility in any tort system. And so I – that's a liability issue down the road. Here it's important to preserve State tort law, because Congress said State tort law shall be preserved. And again, whether it's a choice between options type 1 or type 2, or whether it's potential liability for not going beyond the minimum breaking standard, either way manufacturers should be held accountable, according to Congress in its enactment of this statute, for the design choices they make. There's nothing different about a design standard option 1 versus option 2. The final point I want to make before I sit down is that I think in some respects this case, with regard to the question about whether Congress intended for the agency to be the exclusive authority for weighing these types of considerations, in some – in some respects Wyeth v. Levine is instructive here. Because I think that that was the same argument that was made in Wyeth v. Levine, that a jury should not be allowed to second-guess the FDA's labeling issues, and that to allow the jury to do so would subvert the exclusive authority of a Federal agency. And the Court rejected that argument in Wyeth. And as the dissent pointed out in Wyeth, that statute did not even have a savings clause, and it did not define the labeling standards as minimum standards. Here we have a much more clear expression of congressional intent. They intended this – these to be minimum standards. They have a savings clause. It says common law liability shall be preserved. Obviously, Congress did not intend NHTSA to be the exclusive safety standard cook. They deliberately preserved State court juries as also providing for additional vehicle safety and for an incentive to manufacture safer vehicles. Thank you, counsel. The case is submitted. The Honorable Court is now adjourned until Monday next, 10 o'clock.